UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MARIO RAMIREZ VASQUEZ, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 1:24-cv-00183-JRO-MG |
| CENTURION HEALTH OF INDIANA, LLC, et al., | ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Mario Vasquez, who is incarcerated at Pendleton Correctional Facility ("PCF"), alleges in this case that the defendants were deliberately indifferent to his eye injury, pain, and loss of vision. Vasquez sues Centurion Health of Indiana, and its employees Dr. John Mershon, Dr. John Nwannunu, Dr. Stephanie Riley, Lisa Hamblen, Jessica Love (collectively "Centurion Defendants"). He also sues Dr. Michael Mitcheff, Dr. Stephen Hill, and Dr. Dennis Lewton. Drs. Hill and Lewton move for summary judgment on the affirmative defense that Vasquez failed to exhaust his available administrative remedies before filing this lawsuit. The other defendants[1] also move for summary judgment on the exhaustion defense[2] and further seek summary judgment on

---

[1] The Centurion Defendants' motion for summary judgment does not directly seek summary judgment in favor of defendant Love or make argument to support granting summary judgment to this defendant. *See generally* dkt. 85. But the Centurion Defendants' reply does seek summary judgment in her favor and the briefing on the parties' motions for summary judgment provides the evidence and argument necessary to resolve this claim.

[2] Drs. Hill and Lewton only recently were served and answered and therefore raised only the exhaustion defense. In addition, although the exhaustion defense should typically

statute of limitations grounds and on the merits of Vasquez's claims. Vasquez also moved for summary judgment. For the reasons that follow, the motion for summary judgment filed by Drs. Lewton and Hill is denied, Dr. Mitcheff's motion for summary judgment is granted and the Centurion Defendants' motion for summary judgment is granted. Vasquez's motion for summary judgment is denied.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates

be determined before reaching the merits of a plaintiff's claims, the remaining defendants were allowed to amend their answer to raise this defense. Dkt. 127.

the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Loc. Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II. FACTUAL BACKGROUND

Because all parties have moved for summary judgment, the following statement of facts is considered to be undisputed, except where disputes are noted.

### A. IDOC Grievance Process

The Indiana Department of Correction ("IDOC") has a standardized offender grievance process which was in place during the time Plaintiff alleges his rights were violated. Dkt. 86-7. IDOC Policy and Administrative Procedures

00-02-301, Offender Grievance Process ("Offender Grievance Process") is the policy governing the grievance procedure and details how a prisoner must exhaust his administrative remedies using that procedure. *Id.* During the relevant period, the grievance process consisted of three steps: (1) submitting a formal grievance; (2) submitting a written appeal to the facility Warden/designee; and (3) submitting a written appeal to the IDOC Grievance Manager. *Id.* at 9-13. Successful exhaustion of the grievance process requires timely pursuing each step of the process. *Id.* at 9-10, 14.

**B. The Parties**

Dr. John Nwannunu is a medical doctor who works as a primary care provider for the IDOC. *See* dkt. 86-4 ¶ 5; Dkt. 86-1 at 70–72, 80–82.

Dr. John Mershon is licensed to practice medicine in Indiana and worked at PCF during the relevant time. Dkt. 86-4 ¶ 3-4.

Dr. Stephanie Riley works as the Statewide Medical Director for Centurion, starting on October 29, 2021. Dkt. 86-2 ¶ 5-6. As the Medical Director, she oversees all clinical activity in Indiana, including by reviewing requests from providers for specific medications, tests or referrals to outside specialists. *Id.*

Dr. Michael Mitcheff worked as the Regional Medical Director for Wexford of Indiana from July 2018 through June 2021. Dkt. 88-1 ¶ 2. On July 1, 2021, his employment changed to Wexford Health Sources, Inc, which is a separate entity from Wexford for Indiana, LLC. *Id.* ¶ 4. Dr. Mitcheff has never worked for Centurion and was not involved in Vasquez's care during the time Centurion took over care for inmates in the IDOC, starting on July 1, 2021. *Id.* ¶ 7.

Lisa Hamblen is a licensed social worker and works as the Health Services Administrator at PCF. Dkt. 86-3 ¶ 3. Her duties as HSA include ordering medical supplies, hiring nursing staff, responding to Health Care Request Forms ("HCRFs"), and dealing with human resources issues. *Id.* ¶ 4. She does not make medical decisions. *Id.* ¶ 5.

Dr. Stephen R. Hill holds a Doctor of Optometry, is an ophthalmologist who worked as a provider for IDOC and treated Vasquez during the relevant time. Dkt. 86-2 ¶ 9; *see, e.g.*, dkt. 86-1 at 57–64.

Dr. Dennis Lewton holds a Doctor of Optometry, worked as a provider for IDOC, and treated Vasquez during the relevant time. *See* dkt. 86-1 at 16–20.

### C. Vasquez's Medical Care

#### 1. Initial Injury – September 10, 2020

On September 10, 2020, Vasquez reported that he had a right eye injury after being struck with a soccer ball. Dkt. 86-1 at 67.[3] He saw a non-defendant nurse that day, who noted that he had right eye swelling, but no discoloration or blood present in the sclera.[4] *Id.* at 54–56. He was given Tylenol and ice for swelling and pain. *Id.*

---

[3] Defendants cite the Bates number of the medical records, rather than the page number of the filing in the ECF system. They are reminded that the Court's Order Setting Pretrial Schedule and Discussing Discovery in Prisoner Litigation provides: "References to exhibits submitted in support of the motion for summary judgment must not be to the BATES label, but should be to the page number (or paragraph number, as appropriate). Dkt. 41 at 4–5. **Counsel must follow these directions in future filings**.

[4] The sclera, or white of the eye, is strong tissue that wraps around the eyeball. Cleveland Clinic, *Sclera*, https://my.clevelandclinic.org/health/body/22088-sclera (last visited Sept. 16, 2026).

Vasquez submitted an HCRF on October 12 reporting blurred vision and dark spots after his soccer injury. *Id.* at 68. He requested an eye exam and was scheduled for it. *Id.* Vasquez saw Dr. Hill on November 6. *Id.* at 57–58. Dr. Hill reported normal findings and that Vasquez had an intact retina. *Id.*

**2. Continuing Complaints – 2021**

Vasquez submitted an HCRF on January 17, 2021, asking for an exam for his right eye stating that he still had blurry vision after his soccer injury. Dkt. 86-1 at 51. The staff member who responded to this request did not sign the response but stated that Vasquez had been seen in November, that he should give it more time to heal, and he should submit another request in 30 days if his eye did not improve. *Id.* Vasquez submitted another request in April of 2021, reporting that his condition had not improved and he had started to feel pain in his eye. *Id.* at 69. He was scheduled to see the optometrist and saw Dr. Hill on May 18. *Id.* at 59–60. Dr. Hill saw Vasquez again on May 25. *Id.* at 61–62. Dr. Hill noted normal filings and gave Vasquez additional information about cataracts. *Id.* Vasquez submitted another HCRF on August 14, 2021, stating that the continued to experience excruciating pain in his right eye. Dkt. 103-1 at 562.[5] He also wrote a letter to Centurion that day about his eye issues and his

[5] Vasquez contends that his retina became detached between August and October of 2021, but he does not designate specific evidence to support a conclusion that this is the date of his retinal injury and does not deny that his initial injury occurred on September 20, 2020, when he was hit in the face with a soccer ball.

need for a translator. *Id.* at 498. He submitted another HCRF on October 1 complaining of eye pain and blurriness. *Id.* at 563.

**3. Specialist Consultations – 2022**

Vasquez submitted an HCRF on January 4, 2022, stating that in April of 2021, he requested an eye exam and was prescribed glasses instead. Dkt. 86-1 at 50. He reported pain and loss of vision in his right eye. *Id.* Dr. Hill evaluated Vasquez for potential cataract surgery on March 18 and submitted a request for a surgical consultation. *Id.* at 63–64. In response to this request, Dr. Riley requested additional information, including whether Vasquez's condition was affecting his activities of daily living or if his visual acuity was 20/60 or worse. *Id.* at 27. Dr. Hill evaluated Vasquez again on April 15, in response to Dr. Riley's request for additional information. *Id.* at 4. Dr. Hill noted that Vasquez's eye injury resulted from a soccer ball to the face "years ago" and confirmed that Vasquez's vision warranted the surgery. *Id.* Dr. Riley reviewed Dr. Hill's findings on April 20 and approved the specialist consultation. Dkt. 86-2 ¶ 11.

Vasquez submitted another HCRF on June 13. Dkt. 86-1 at 49. He saw Dr. Hill on June 17. *Id.* at 5. Dr. Hill told Vasquez that his cataract surgery paperwork was still being processed and told him to reach out to Hamblen. *Id.* Vasquez saw Dr. Elizabeth Groves at Ascension Medical Group for a cataract consultation on June 23. *Id.* at 29–31. Vasquez does not speak English and could not communicate with her. Dkt. 102 at 11. Her exam revealed a potential right eye retinal detachment and she requested further evaluation. Dkt. 86-1 at 29–31. Therefore, Dr. Hill requested a retinal scan on June 24. *Id.* at 6-8.

A detached retina presents a serious medical issue when it occurs. Dkt. 86-2 ¶ 14. To prevent permanent vision loss, a detached retina requires surgical intervention relatively quickly. *Id.* The best outcomes occur if the surgery happens within three days of the retinal detachment. *Id.* Surgical intervention has varying degrees of success up to approximately 20 to 30 days after the retinal detachment. *Id.* After 20 to 30 days, the chances of successful intervention to prevent permanent vision loss are virtually non-existent. *Id.*

Love requested approval for this consultation on June 27, and Centurion's utilization management team approved it on June 29. Dkt. 86-1 at 28. Vasquez had an appointment at the Eskenazi Health Eye General Clinic on September 23. *Id.* at 33–34. Vasquez reported that he had immediate onset loss of vision in his right eye after being struck with a soccer ball about three years before.[6] *Id.* He was told that surgery had an "extremely limited visual prognosis." *Id.* Vasquez submitted an HCRF on September 26, reporting pain in his right eye and dark spots in his vision. *Id.* at 48. He saw Dr. Mershon for a follow-up on his ophthalmology appointment on October 3. *Id.* at 14–15. Dr. Mershon noted that Vasquez reported pain, that both eyes appeared normal, that he did not have the records from Vasquez's ophthalmology exam, but that Vasquez was scheduled to see the eye doctor the next day. *Id.* Dr. Mershon determined that prescribing further medication or treatment at that time would be inappropriate because Vasquez was going to see the optometrist the next day. Dkt. 86-4 ¶ 8. Vasquez

[6] This record reflects that the soccer injury occurred in 2019, but the parties agree that it happened in September of 2020, so the Court assumes this is a typo.

saw Dr. Lewton the next day and Dr. Lewton requested an additional consultation with a retinal specialist. Dkt. 86-1 at 16–17.

On October 31, Vasquez submitted an HCRF requesting the results from his September 23 eye exam and reporting dryness, headaches, and dark spots in his vision. *Id.* at 47. He was scheduled to see a provider. *Id.* Dr. Lewton saw Vasquez for a vision screening on November 8 and noted no change to his vision and that he was scheduled to see an outside ophthalmologist. *Id.* at 40.

On December 27, Vasquez got a second opinion regarding his retinal detachment. *Id.* at 36–39. The doctors stated Vasquez had an "extremely limited visual prognosis" and that "the chance of clear vision from this eye is extremely low and there is a chance of it becoming a blind, painful eye, and that the risks [of surgical intervention] likely outweigh the benefits. [Patient] understands and elects to observe for now." *Id.* at 36. He was provided pain-relieving eye drops. *Id.* at 37.

**4. Ongoing Pain – 2023**

Vasquez submitted an HCRF on January 25, 2023, requesting his eye drops and those medications were ordered. *Id.* at 53. He started receiving his atropine eye drops daily. *Id.* at 18–20. He saw Dr. Lewton on February 17, and Dr. Lewton requested a follow-up appointment with ophthalmology. *Id.*

Vasquez submitted another HCRF on April 7 reporting eye pain and requesting information on a follow-up appointment. *Id.* at 46. He saw Dr. Mershon on April 18, who noted that "it seems [Vasquez] elected not to have" surgery because of poor expected outcomes. *Id.* at 22–23. Dr. Mershon

prescribed Diclonfenac eye drops to help ease his eye pain, and Vasquez was already scheduled for a follow up ophthalmology appointment. *Id.* Vasquez denies declining surgery, explaining that he does not speak English and must have been misunderstood by the outside specialists.

Vasquez saw doctors at Eskenazi Eye Clinic on May 3, for a follow-up. *Id.* at 42–44. The doctors again noted that surgery had an "exceedingly poor visual prognosis" and a high risk of complication. *Id.* They recommended discontinuing the Diclonfenac eye drops, using polycarbonate eyeglasses, and that Vasquez return in a year. *Id.* Vasquez's Diclonfenac eye drops were discontinued on May 5. *Id.* On May 10, Dr. Mershon prescribed prednisolone acetate eye drops. *Id.* at 25–26.

Vasquez submitted an HCRF on July 7 reporting that he had pain and dryness in his right eye and requested an eye exam. *Id.* at 45. He saw non-party Dr. Joseph LaPlaca on August 18, and his eye drop medication was reviewed and no changes were made. *Id.* at 65–66. Vasquez submitted another HCRF on January 13, 2024, reporting eye pain, headaches, and dizziness. *Id.* at 84. Vasquez filed this lawsuit on January 26, 2024. Dkt. 2.

He filed another HCRF on March 25, reporting eye pain, headaches, and dizziness. *Id.* at 83. He saw Dr. Nwannunu on May 16, because of his concerns about a facial lipoma and swelling. *Id.* at 70–72. Vasquez did not voice any complaints about his eyes during this visit. *Id.*

Vasquez had an annual nurse well visit on May 30. *Id.* at 73–76. He was prescribed ibuprofen for his eye pain on August 14. *Id.* at 77–79. He was

prescribed erythromycin eye ointment and six days of naproxen for his eye pain on January 7, 2025. *Id.* at 78. On March 25, 2025, Vasquez saw Dr. Nwannunu for headaches. *Id.* at 80–83. He did not report any vision problems. *Id.*

On August 18, Dr. Joseph LaPlaca submitted a request for an ophthalmology consultation. Dkt. 103-1 at 40–41. Non-party Rebecca Lubelczyk denied this request. *Id.* at 438.

**D. Grievances**

Vasquez submitted a grievance on August 4, 2021, stating that he was waiting to see a specialist for his eye pain. Dkt. 103-1 at 559.

On December 30, 2022, Vasquez submitted a formal grievance about his eye injury and medical treatment and stating that the date of the incident was September 10, 2020. Dkt. 86-5 at 13. He stated that he suffered a right eye injury in September of 2020, that he complained about his eye condition for two years, and that when he was seen by an ophthalmologist in December 2022, he was told it was too late to repair his eye. *Id.* For relief, he requested eye surgery and "any remedy deemed that is just, proper and appropriate." *Id.* The grievance specialist responded to this grievance on January 25, 2023. The grievance specialist erroneously thought the date of the incident was September 10, 2022, but still found the grievance to be untimely because it was not submitted within the 10 business day time frame in the grievance policy. Dkt. 86-6 ¶ 13.

Vasquez submitted another grievance on January 27, 2023. Dkt. 86-5 at 11. This grievance was similar to his first grievance but stated that the date of the incident was January 27, 2023. *Id.* Vasquez asked "to receive proper medical

care, the prescribed medications, and surgery." *Id.* The grievance specialist responded to this grievance stating that "A new OPR had to be submitted and this had been done and is being scheduled." *Id.* at 10. The response continued "based on the above information there is no other relief I can offer." *Id.* Vasquez appealed this response on March 1. *Id.* at 7–9. The response to his appeal stated that he had been receiving medicine for chronic retinal detachment and the eye doctor did not recommend surgery. *Id.* at 6. Vasquez filed a second-level appeal on May 15, stating "Mr. Regal is wrong since my eye injury happen[ed] in September 10, 2020. I shouldn't have been forced to wait to see the specialist (optometrist) so long in that my eye was savable when injured on an accident." *Id.* at 4–5. On July 5, the IDOC grievance coordinator agreed with the facility responses. *Id.* at 2.

## III. DISCUSSION

### A. Exhaustion of Administrative Remedies

The PLRA requires that a prisoner exhaust available administrative remedies before suing over prison conditions. 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted).

"To exhaust administrative remedies, a prisoner must comply strictly with the prison's administrative rules by filing grievances and appeals as the rules dictate." *Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020) (*citing Woodford v.*

*Ngo*, 548 U.S. 81, 90-91 (2006)). A "prisoner must submit inmate complaints and appeals 'in the place, and at the time, the prison's administrative rules require.'" *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)).

"Because exhaustion is an affirmative defense," Defendants face the burden of establishing that "an administrative remedy was available and that [Vasquez] failed to pursue it." *Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015). "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Ross v. Blake*, 578 U.S. 632, 642 (2016) (internal quotation omitted). "[A]n inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* (internal quotation omitted). The Seventh Circuit "has taken a strict compliance approach to exhaustion." *Wilborn v. Ealey*, 881 F.3d 998, 1004 (7th Cir. 2018). "An inmate must comply with the administrative grievance process that the State establishes...." *Id.*; *see also Ross,* 578 U.S. at 639 (the mandatory language of the PLRA "means a court may not excuse a failure to exhaust...").

Drs. Hill and Lewton argue that Vasquez failed to exhaust his available administrative remedies because his grievances were untimely. Indeed, Vasquez's eye issues started after his September 10, 2020, soccer injury, and he filed his first grievance on December 30, 2022. Dkt. 86-5 at 13. That grievance was denied as untimely. *Id.* at 12.

The next grievance Vasquez filed on January 27, 2023, was also untimely, but the prison responded to it on its merits rather than reject it. *Id.* at 11. It is undisputed that the grievance specialist responded to this grievance, and Vasquez submitted all required appeals. Dkt. 86-5 at 2-10. Drs. Hill and Lewton have therefore failed to meet their burden to show that Vasquez failed to exhaust his available administrative remedies. According to the Seventh Circuit's holding in *Maddox v. Love*, once grievance officials responded to Vasquez's January 27, 2023, grievance on its merits, they waived any procedural error in filing it. 655 F.3d 709, 722 (7th Cir. 2011) ("Where prison officials address an inmate's grievance on the merits without rejecting it on procedural grounds, the grievance has served its function of alerting the state and inviting corrective action, and defendants cannot rely on the failure to exhaust defense.").

Drs. Hill and Lewton seek to distinguish *Maddox* and argue that Vasquez did not specifically name them in his grievances, so he failed to exhaust his administrative remedies as to them. The Seventh Circuit has indeed distinguished *Maddox* and found a failure to exhaust when the prison could not fairly identify the potential defendant, or the grievance otherwise failed to put the prison "on notice" of who was likely to be involved. *E.g.*, *King v. Dart*, 63 F.4th 602, 609 (7th Cir. 2023) (holding that grievance failed to indicate that correctional officers were responsible for his injuries because the grievance only identified medical staff); *Roberts v. Neal*, 745 F.3d 232, 235–36 (7th Cir. 2014) (holding that the grievance failed to indicate that the defendant was the accused, in part, because the grievance suggested that a doctor was at fault and the

defendant was not a doctor). In other words, a prisoner must still "provide 'some identifying information about the accused individuals'" that will allow the prison to "properly 'investigate and resolve grievances.'" *Jackson v. Esser*, 105 F.4th 948, 959–60 (7th Cir. 2024) (quoting *King*, 63 F.4th at 609) and *Williams v. Wexford Health Sources, Inc.*, 957 F.3d 828, 834 (7th Cir. 2020)).

But the January 27, 2023, grievance does just that, so *Maddox* cannot be distinguished here. Vasquez's grievance complaining about his eye care was filed while he was under the care of Drs. Hill and Lewton, who are undisputably doctors of optometry. This was enough to put the prison on notice of Vasquez's eye problem, allow it to identify who was likely involved in his care, and give officials the opportunity to address his complaint. *See d*kt. 86-5 at 11; Dkt. 86-6 ¶ 14. Because Drs. Hill and Lewton have not met their burden to show that Vasquez failed to exhaust his available administrative remedies before filing this lawsuit, their motion for summary judgment on exhaustion grounds is **denied**.

### B. Statute of Limitations

Next, the Centurion defendants argue that Vasquez's claims are barred by the applicable statute of limitations.

Claims brought under § 1983 "borrow the limitations period and tolling rules applicable to personal-injury claims under state law." *Devbrow v. Kalu*, 705 F.3d 765, 767 (7th Cir. 2013). "The pertinent Indiana statute of limitations is two years." *Id.* (citing Ind. Code § 34–11–2–4). But federal law governs the accrual of § 1983 claims. *Ghelf v. Town of Wheatland*, 132 F.4th 456, 469 (7th Cir. 2025). A § 1983 claim accrues when the plaintiff "knows his injury and its cause . . .

even if the full extent or severity of the injury is not yet known." *Devbrow v. Kalu*, 705 F.3d 765, 768 (7th Cir. 2014) (citation modified); *see Wallace v. Kato*, 549 U.S. 384, 388 (2007). But when a prisoner contends that "the defendants inflicted cruel and unusual punishment. . .by refusing to treat his condition" then."[e]very day that they prolonged his agony by not treating his painful condition marked a fresh infliction of punishment that caused the statute of limitations to start running anew." *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001).

Vasquez contends in this case that the Centurion Defendants delayed treating his eye injury for years. Much of the Centurion Defendants' alleged unconstitutional behavior occurred within two years of the date he filed the complaint on January 26, 2024. And each failure to treat restarted the running of the statute of limitations. The Centurion defendants therefore have failed to show that the statute of limitations bars his claims.

**C. Deliberate Indifference**

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious

medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The Court assumes that Vasquez's eye condition was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that the defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Vasquez's] health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

Deliberate indifference requires more than negligence or even objective recklessness. *Id.* Rather, Vasquez "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted). The Seventh Circuit has held that deliberate indifference occurs when the defendant treatment that departs substantially from accepted professional judgment, refuses to take instructions from a specialist, knowingly persists in an ineffective treatment, or inexplicably delays medical treatment. *Petties*, 836 F.3d at 729–30.

**1. Drs. Mershon and Nwannunu**

Drs. Mershon and Nwannunu argue that their interactions with Vasquez about his eye pain were limited and do not reflect deliberate indifference.

Dr. Mershon saw Vasquez for a follow-up on his ophthalmology appointment on October 3, 2022. Dkt. 86-1 at 14–15. Dr. Mershon noted that Vasquez reported pain, that both eyes appeared normal, that he did not have the records from Vasquez's ophthalmology exam, but that Vasquez was scheduled to see the eye doctor the next day. *Id.* Dr. Mershon determined that prescribing further medication or treatment at that time would be inappropriate because of the imminent optometry appointment. Dkt. 83-6 ¶ 8. Indeed, Vasquez did see Dr. Lewton the next day, who requested an additional consultation with a retinal specialist. Dkt. 86-1 at 16–17. Vasquez next saw Dr. Mershon on April 18, 2023, who noted that Vasquez opted not to have surgery because of poor expected outcomes. *Id.* at 22–23. Dr. Mershon prescribed Diclonfenac eye drops for his eye pain and Vasquez was already scheduled for an ophthalmology appointment. *Id.* Vasquez saw doctors at Eskenazi Eye Clinic about two weeks later. *Id.* at 42–44. The doctors noted that surgery had an "exceedingly poor visual prognosis" and a high risk of complication. *Id.* They recommended discontinuing the Diclonfenac eye drops and providing Vasquez polycarbonate eyeglasses. *Id.* Vasquez's Diclonfenac eye drops were discontinued on May 5 and Dr. Mershon prescribed prednisolone acetate eye drops on May 10. *Id.* at 25–26, 42–44.

Vasquez denies declining surgery, but he designates no evidence that Dr. Mershon should have known this and does not designate evidence to refute the evidence that the specialists recommended against surgery at that time. *See* dkt 96 at 11. He argues generally that Dr. Mershon was aware or should have been aware that he had a retinal detachment, that this was an emergency, and that

he needed a specialist follow-up. Dkt. 103 at 26; dkt. 96 at 17. But Vasquez designates no evidence to allow a factfinder to conclude that Dr. Mershon was aware of his injury before October of 2022. Further, Vasquez does not designate evidence that, when Dr. Mershon did examine Vasquez, he made any decisions that were so far outside professional judgment as to amount to deliberate indifference.

Next, Vasquez first saw Dr. Nwannunu on May 16, 2024, for his concerns about a facial lipoma and swelling. *Id.* at 70–72. Vasquez did not voice any complaints about his eyes during this visit. *Id.* On March 25, 2025, Vasquez again saw Dr. Nwannunu for headaches. *Id.* at 80–83. He again did not report any vision problems. *Id.*

Vasquez argues that Dr. Nwannunu failed to ensure that he saw the specialist and should have known that the specialist recommended follow-up and that Dr. LaPlaca requested a follow-up in August of 2023. Dkt. 103 at 30.[7] As with Dr. Mershon, Vasquez has designated no evidence that would allow a jury to conclude that Dr. Nwannunu was aware of his eye injury or had any knowledge that he needed immediate treatment or surgery.

Drs. Mershon and Nwannunu are entitled to summary judgment.

---

[7] Vasquez also argues that Dr. Nwannunu failed to answer his interrogatories. But, if this were the case, Vasquez could have sought resolution of this issue with the Centurion defendants and filed a motion to compel consistent with the Order Setting Pretrial Schedule and Discussing Discovery in Prisoner Litigation. Dkt. 41. At this stage, it is too late to bring up any discovery disputes.

**2. Lisa Hamblen and Jessica Love**

Vasquez argues generally that Hamblen and Love "were the administrators who became aware that Plaintiff was suffering in pain after his right retinal detachment and hypotony of eye need for surgery though Plaintiff's grievances and healthcare requests" and concludes that they were responsible for delaying his treatment. Dkt. 103 at 32. But Vasquez designates no evidence that Hamblen was ever involved in his medical care or aware of his condition. Without such evidence, no reasonable jury could find that she was deliberately indifferent. Similarly, the only designated evidence of Love's involvement in Vasquez's care is that she requested a consultation with a retinal specialist after the ophthalmologist recommended it. Dkt. 86-1 at 28. There is no designated evidence that Love was otherwise aware of Vasquez's condition or disregarded it.

Because no reasonable jury could find that Hamblen or Love were deliberately indifferent to Vasquez's condition, they are entitled to summary judgment.

**3. Michael Mitcheff**

Dr. Mitcheff seeks summary judgment arguing that there is no evidence that he was involved in any of Vasquez's medical care. Dr. Mitcheff has designated evidence that he was the Regional Medical Director for Wexford and never worked for Centurion. To the extent that Vasquez alleges that Dr. Mitcheff was part of Centurion's collegial board of review or aware of his need for eye

surgery, he has designated no evidence to support this conclusion.[8] Because there is no evidence to support the conclusion that Dr. Mitcheff was involved in Vasquez's medical care, Dr. Mitcheff is entitled to summary judgment.

**4. Dr. Riley**

Dr. Riley is the Statewide Medical Director for Centurion and started working in that capacity in October of 2021, more than a year after Vasquez's eye injury. Dkt. 86-2 ¶ 6.

Vasquez argues that Dr. Riley used her position as a policy maker for Centurion to save money by delaying his medical care. Dkt. 96 at 12. He argues that Dr. Riley was aware that he had a right retinal detachment and hypotony of his eye. *Id.* at 17. But he designates no evidence that would allow the conclusion that Dr. Riley knew about his eye injury before Dr. Hill requested a surgical consultation in March of 2022. Dkt. 86-1 at 63–65. In response to Dr. Hill's request, Dr. Riley requested additional information, including whether Vasquez's condition was affecting his activities of daily living or if his visual acuity was 20/60 or worse. *Id.* at 27. Then, when Dr. Hill evaluated Vasquez again on April 15, in response to Dr. Riley's request for additional information, and confirmed that Vasquez's vision warranted the surgery, Dr. Riley approved it. Dkt. 86-2 ¶ 11. Vasquez has not designated evidence to allow a reasonable jury to conclude that Dr. Riley consciously disregarded a risk to his health. She is therefore entitled to summary judgment.

---

[8] Vasquez points to the Centurion Defendants' expert disclosures, but that document does not list Dr. Mitcheff and therefore does not support a conclusion that he worked for Centurion. Dkt. 103-1 at 360.

**5. Centurion**

Private corporations acting under color of state law are treated as municipalities for purposes of § 1983. *Dean*, 18 F.4th at 235. Section 1983 generally does not allow a municipality or corporation to be held liable for the actions of its agents or employees. As the Seventh Circuit has explained

> There are at least three types of municipal action that may give rise to municipal liability under § 1983: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. Inaction, too, can give rise to liability in some instances if it reflects a conscious decision not to take action.

*Id.* (internal citations omitted). "[I]f institutional policies are themselves deliberately indifferent to the quality of care provided, institutional liability is possible." *Glisson v. Ind. Dep't. of Corr.*, 849 F.3d 372, 378 (7th Cir. 2017) (en banc). To establish *Monell* liability here, a reasonable jury must be able to find from the designated evidence that Centurion suffered from "systemic and gross deficiencies in staffing, facilities, equipment, or procedures." *Daniel v. Cook County*, 833 F.3d 728, 735 (7th Cir. 2016). Vasquez must then "show that a policymaker or official knew about these deficiencies and failed to correct them." *Id.*; *see also Glisson*, 849 F.3d at 381–82.

Vasquez argues that the collegial review requirement for surgery consultations caused unnecessary delays in his treatment. Centurion argues that Centurion's policies requiring approval for outside consultations were

reasonable. Indeed, a policy of requiring "collegial review is not unconstitutional on its face." *Dean*, 18 F.4th at 236 (7th Cir. 2021). And, to the extent that Vasquez argues that the collegial review requirement resulted in deliberate indifference to his need for treatment, specifically, "where the policy relied upon is not itself unconstitutional, *considerably more proof than the single incident will be necessary in every case* to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." *Id.* (quoting *City of Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985) (emphasis in *Dean*). Vasquez does not designate evidence of a pattern of delays in necessary treatment caused by the collegial review process and therefore has not designated enough evidence to allow a jury to find Centurion liable based on this theory.

The same reasoning applies equally to Vasquez's arguments that Centurion "lost him in the system," resulting in delays in evaluations and treatment, delayed his consultations, and failed to provide him with a translator. Again, Vasquez designates no evidence of an ongoing practice of delays. In fact, Vasquez argues that Centurion policy requires a translator, but he did not receive one. Vasquez's individual experience is not enough to allow a jury to conclude that Centurion had a policy of failing to provide translators when necessary.

Finally, Vasquez argues that Centurion failed to provide clear duties and titles for its medical staff and failed to have a policy regarding eye treatment. The Seventh Circuit has explained that

> the path to *Monell* liability based on inaction is steeper because unlike in a case of affirmative municipal action, a failure to do something could be inadvertent and the connection between inaction and a resulting injury is more tenuous. For these reasons, where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.

*J.K.J. v. Polk Cnty.*, 960 F.3d 367, 378 (7th Cir. 2020).

Vasquez bases his argument that Centurion had a custom and practice of not defining clear titles and duties for its medical staff on Centurion's response to his request for production of documents, in which he asks for the title and duties of each defendant. Centurion's response states that this request asks for creation of a document that does not exist and would be better suited to an interrogatory. Dkt. 103-1 at 488. This is not evidence that Centurion employees did not have clear duties. Moreover, Vasquez has not designated evidence to allow a jury to conclude that any such alleged failure resulted from a Centurion policy, practice, or custom. Similarly, Vasquez has not designated evidence to support his argument that any failure by Centurion to have specific policies regarding eye treatment resulted in any delays in his care.

In sum, Vasquez has not designated evidence to allow a jury to conclude that any failures in his treatment resulted from a policy, practice, or custom of Centurion.[9] Centurion is therefore entitled to summary judgment.

---

[9] Vasquez also states that nurses told him that doctors will not put in an OPR for his eye because it costs too much. Dkt. 96 at 11. But he doesn't identify those nurses or submit sworn testimony to support this statement.

## IV. CONCLUSION

Vasquez has not designated evidence that the Centurion Defendants were deliberately indifferent to his condition. Therefore, the Centurion Defendants' motion for summary judgment, dkt. [84], is **GRANTED.** Vasquez's motion for summary judgment, dkt. [95], is **DENIED**. The claims against defendants Centurion Health of Indiana, Lisa Hamblen, John Merhson, John Nwannunu, Stephanie Riley, and Jessica Love are dismissed. The **clerk shall terminate** these defendants on the docket.

Vasquez further has not designated evidence that defendant Dr. Mitcheff was involved in his care. Dr. Mitcheff's motion for summary judgment, dkt. [88], is therefore **GRANTED** and the **clerk shall terminate** him as a defendant.

The claims against Drs. Hill and Lewton remain. As discussed above, Drs. Hill and Lewton did not meet their burden to show that Vasquez failed to exhaust his available administrative remedies before he filed this lawsuit. Their motion for summary judgment, dkt. [133], is therefore **DENIED**. In addition, because the designated evidence shows that Vasquez did exhaust his available administrative remedies, Drs. Hill and Lewton shall have **through October 1, 2026**, to show why summary judgment should not issue in Vasquez's favor on this defense.

**SO ORDERED.**

Date: 9/17/2026



Justin R. Olson
United States District Judge
Southern District of Indiana

Distribution:

MARIO RAMIREZ VASQUEZ
231420
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
Stoll Keenon Ogden PLLC
doug.bitner@skofirm.com

Scott B. Cockrum
LEWIS, BRISBOIS, BISGAARD & SMITH LLP
Scott.Cockrum@lewisbrisbois.com

Ronald A. Mingus
REMINGER CO. LPA (Indianapolis)
rmingus@reminger.com

Taylor Lee Rasey
Lewis Brisbois
taylor.rasey@lewisbrisbois.com